Argued and submitted October 2, 1996, reversed in part; otherwise affirmed on appeal and cross-appeal June 25, 1997

Lazaro and Vivian MENDIETA,
William and Ann Tracy, LX Ranch, Inc.,
Beaty Butte Grazing Association,
an unincorporated association
of individuals and companies,
Donald G. Toelle, and Jenkins Ranch, Inc.,
for themselves individually and for all
other persons similarly situated,
*Respondents - Cross-Appellants - Cross-Respondents,*

*v.*

STATE OF OREGON,
acting by and through the
DIVISION OF STATE LANDS,
*Respondent - Cross-Appellant - Cross-Respondent,*

Michele McKAY, for herself,
and on behalf of her minor children,
Erin and Allison McKay,
Kristoen Winkle, for herself,
and on behalf of her minor children,
Regina, Justin and Garrison Winkle,
Dee Stryker Coleman, for herself,
and on behalf of her minor children,
Sydney Meryl and Zane Stryker Coleman,
Rest the West,
an Oregon nonprofit corporation,
Oregon Natural Desert Association,
an Oregon nonprofit corporation,
and Oregon Natural Resources Coalition,
an Oregon nonprofit coalition,
*Appellants - Cross-Respondents.*

(94-04-10725-E; CA A87490)

941 P2d 582

James S. Coon argued the cause for appellants - cross-respondents. With him on the briefs was Swanson, Thomas & Coon.

Daniel E. O'Leary argued the cause for respondents - cross-appellants - cross-respondents. With him on the briefs were Timothy R. Volpert and Davis Wright Tremaine.

Rives Kistler, Assistant Attorney General, argued the cause for respondent - cross-appellant - cross-respondent State of Oregon. With him on the briefs were Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General.

Lindsay J. Slater filed a brief *amicus curiae* for Intervenor Oregon Cattlemen's Association.

Before Riggs, Presiding Judge, and Landau and Leeson, Judges.

LANDAU, J.

**LANDAU, J.**

Plaintiffs, a group of Eastern Oregon ranchers, initiated this action to force the Division of State Lands (DSL) to grant them 20-year grazing leases with automatic 20-year renewal options and to obtain reformation of those leases to insert a missing clause regarding their valuation. The trial court ordered DSL to grant the 20-year leases with the automatic lease renewals, but it declined to reform the leases to add the missing valuation clauses. We reverse the portion of the judgment ordering DSL to grant the longer lease terms and otherwise affirm.

We begin with the parties' arguments concerning the terms of the leases and the applicable extension periods, stating the facts necessary to the disposition of those arguments. Following that disposition, we address the parties' arguments concerning the claims for reformation, stating separately the facts relevant to those claims.

Regarding the first group of claims, the facts necessary to our decision are not in dispute. The State of Oregon has acquired, by a variety of means, approximately 500,000 acres of land east of the Cascade Mountains. The state received a substantial portion of the land when it was admitted into the Union in 1859. Under the terms of the Admission Act, the United States granted the state sections 16 and 36 of each township "for the use of schools." Admission Act, ch 33, 11 Stat 383 (1859). The State Land Board manages those lands, and, under Article VIII, section 5(2), of the Oregon Constitution, is charged with "obtaining the greatest benefit for the people of this state, consistent with the conservation of this resource under sound techniques of land management." DSL serves as the administrative agency through which the Land Board manages the "common school lands." The Land Board, through DSL, leased most of the common school lands in the area to private ranchers for grazing purposes. Apparently, there was no stated policy on the duration or renewal of the leases.

For many years, much of the common school lands lay in noncontiguous parcels, which made it difficult for the Land Board to manage effectively the land consistent with its

constitutional obligations. In 1969, the Land Board and federal authorities began to exchange state and federal lands to consolidate the state's holdings into more manageable "blocks." The federal lands, however, also had been leased to private ranchers for grazing, and those leases were granted for periods of up to 10 years, subject to cancellation only on fairly narrow grounds.[1] To facilitate the exchange of federally leased land for state lands, in 1979, the Land Board adopted a policy "to issue leases for its blocked lands for a term of ten years." The Land Board hoped that the assurance of a longer lease term would provide an incentive for ranchers to participate in the exchange.

Four years later, several ranchers requested that DSL recommend to the Land Board that it amend its policy to extend the lease terms to 20 years with an automatic 20-year right of renewal. DSL did so, and, in 1983, the Land Board approved a revision to the 1979 policy statement that "[g]razing leases shall be for 20 years instead of 10 years." The revision further provided that, as long as a lessee is not in default and is otherwise in compliance with all relevant lease conditions, the "lessee shall have the right to continue the lease for an additional term of 20 years." In the years following the adoption of the 1983 policy revisions, some lessees of blocked grazing land were offered 20-year leases with an automatic 20-year renewal period, but most were not. None of the lessees complained, however, and those offered shorter terms entered into the leases without objection.[2]

In 1993, DSL recommended a new policy on grazing leases, which, among other things, would limit the term of a

---

[1] The federal grazing management program is governed by the Taylor Grazing Act, 43 USC § 315 *et seq* (1986 & Supp 1997). Under that statute, grazing permits are granted for periods of up to 10 years, subject to renewal as provided by rules promulgated by the Secretary of the Interior. 43 USC at § 315b. Permittees or lessees that remain in compliance with applicable regulations are given "first priority" for renewal. 43 CFR § 4130.2(e). Apparently, in practice, that means that the permits or leases rarely were cancelled.

[2] It is unclear why DSL offered the shorter leases. DSL contends that it is because it understood the 1983 revisions to the Land Board's policy to apply only to those ranchers whose complaints precipitated the changes. And some ranchers agree with that understanding. Others assert that they simply did not understand that they had the right to insist on 20-year leases with automatic 20-year extensions. It is not necessary for us to resolve that question, as it is not pertinent to the issues before us on appeal.

lease to 10 years. The Land Board approved the recommended changes, in concept, and DSL began work on implementing rules for approval by the Land Board. Meanwhile, as existing leases expired, DSL approved extensions of only a year or less, in anticipation of the adoption of a new policy.

Plaintiffs initiated this action on April 25, 1994. Plaintiffs alleged three claims for relief: (1) for a declaration under the Declaratory Judgment Act, ORS 28.010, that, among other things, the leases created in the land exchange process must conform to the 1983 revisions to the land exchange and grazing lease policy and provide for terms of 20 years, with automatic renewal periods of an additional 20 years; (2) for judicial review under ORS 183.484, relating to orders other than contested cases, requiring DSL to comply with the 1983 policy revisions; and (3) for judicial review under ORS 183.490, relating to agency failure to take action, requiring DSL to do the same.[3]

DSL answered, asserting a number of affirmative defenses and a counterclaim. Pertinent to this appeal is DSL's affirmative defense that plaintiffs' claims are untimely. According to DSL, judicial review of agency orders must be obtained under the APA, not the Declaratory Judgment Act. As for the claim brought under ORS 183.490, DSL contended that the statute affords relief only in the face of agency inaction and does not apply when an agency takes action that is allegedly contrary to law. DSL contended that the sole remedy for judicial review of agency action lies under ORS 183.484(2), for which there is a limitation period of 60 days from the service of the agency order that is the subject of the petition for judicial review. DSL argued that, because the orders in this case—the leases executed by DSL and plaintiffs—had been served years before the filing of the complaint, the action is time barred. A number of intervenors, including Rest the West, Oregon Natural Desert Association, Oregon Natural Resources Council and several individuals,

---

[3] The complaint named as defendant, the State of Oregon, "acting by and through the State Land Board and the Division of State Lands." The state, however, answered on behalf of the Division of State Lands only. All subsequent pleadings, in fact, name as defendant the State of Oregon acting by and through the Division of State Lands. The judgment is encaptioned likewise, as is the notice of appeal.

all of whom we refer to collectively as "Rest the West," asserted that plaintiffs' claims are time barred. They also argued that requiring DSL to grant the requested lease extensions would violate a number of constitutional and statutory provisions governing the management of common school lands.[4] Before trial, DSL moved to dismiss the declaratory judgment claim, arguing that the sole remedy for judicial review of agency action lies under the APA. The trial court denied the motion.

After trial, the court issued a 40-page opinion containing findings of fact and conclusions of law that, as relevant, included that the grazing leases were agency "orders" issued in other than a contested case within the meaning of ORS 183.484(2), that plaintiffs had failed to file their petition for judicial review of those orders within 60 days and that, accordingly, plaintiffs' petition for relief under ORS 183.484(2) is time barred. The trial court also concluded, however, that plaintiffs are free to seek the same relief under ORS 183.490. According to the trial court, that statute authorizes a court not merely to compel an agency to act, but also to compel an agency to act in accordance with a stated policy. The court held that, because plaintiffs complained of DSL's failure to act in accordance with the 1983 policy revisions, they were entitled to relief under ORS 183.490, and that, because actions brought under that statute are not subject to the statute of limitations that applies to actions brought under ORS 183.484(2), plaintiffs' action was not untimely.[5] The trial court then entered judgment for plaintiffs for declaratory and injunctive relief as requested in their complaint and awarded plaintiffs attorney fees.

---

[4] Another intervenor, the Oregon Cattlemen's Association, contended that failing to grant the requested leases and extensions would deprive the ranchers of their constitutional property rights without compensation. The Association filed an *amicus* brief on appeal asserting the same position.

[5] The trial court noted that the 60-day statute of limitations that applies to petitions for judicial review brought under ORS 183.484(2) did not apply to actions brought under ORS 183.490. The court further suggested that the action was timely brought,

"even if one assumes, for the sake of argument, that the 60 day filing requirement of ORS 183.484(2) is applicable to an ORS 183.490 action[ ] for judicial review, because the litigation was filed within 60 days of [p]laintiffs learning of [DSL's] failure to act in accordance with the 12/16/83 State Land Board policy."

Because we conclude that ORS 183.490 does not afford plaintiffs any relief, we need not address the correctness of the trial court's *dictum*.

On appeal, Rest the West contends that the trial court erred in concluding that ORS 183.490 affords plaintiffs any relief. In the alternative, Rest the West argues that, by requiring DSL to enter into 20-year grazing leases, the trial court effectively requires the agency to violate various statutory and constitutional provisions concerning the management of common school lands. Rest the West also argues that, even if the trial court correctly awarded plaintiffs the declaratory and injunctive relief that they requested, the court erred in awarding plaintiffs attorney fees. On cross-appeal, DSL contends that the trial court erred in failing to dismiss the claim for declaratory relief. It also agrees with Rest the West that the trial court erred in granting plaintiffs relief under ORS 183.490, because that statute only affords relief in the face of agency inaction.

We begin with the question whether the trial court correctly concluded that ORS 183.490 affords plaintiffs the relief that they seek. Rest the West and DSL argue that the statute applies only when an agency fails to act at all and does not afford relief in a case in which the agency acts, but does so contrary to an applicable rule or policy. Relief in those cases, they argue, is expressly provided for in ORS 183.482, which applies to agency action in a contested case, and ORS 183.484, which applies to orders other than contested cases. In support of their contentions, Rest the West and DSL cite *Bay River v. Envir. Quality Comm.*, 26 Or App 717, 554 P2d 620, *rev den* 276 Or 555 (1976), and *Isom v. PGE*, 67 Or App 97, 677 P2d 59, *rev den* 297 Or 272 (1984). Plaintiffs contend that

> "[i]t is well established in Oregon that ORS 183.490 applies where an agency voluntarily limits its discretion and then fails to act in accordance with those limitations."

In support of their argument, plaintiffs rely on *Lundy v. Morgan*, 31 Or App 151, 570 P2d 84 (1977), and *Wyers v. Dressler*, 42 Or App 799, 601 P2d 1268 (1979), *rev den* 288 Or 527 (1980).

■■ We determine the meaning and applicability of ORS 183.490 by examining its text, in context, and, if necessary, its preenactment history and other applicable interpretive aids. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993). Also relevant to the inquiry is

prior case law regarding the interpretation of that language. *See State v. Sullens,* 314 Or 436, 443, 839 P2d 708 (1992); *Cooksey v. Portland Public School Dist. No. 1,* 143 Or App 527, 531, 923 P2d 1328, *rev den* 324 Or 394 (1996).

■        ORS 183.490 provides:

> "The court may, upon petition as described in ORS 183.484, compel an agency to act where it has unlawfully refused to act or make a decision or unreasonably delayed taking action or making a decision."

Taken by itself, the language of the statute authorizes the court to take action in four cases: (1) where the agency has "refused to act"; (2) where the agency has refused to "make a decision"; (3) where the agency has "unreasonably delayed taking action"; and (4) where the agency has unreasonably delayed "making a decision." Not mentioned as one of the circumstances in which the court may take action under that statute is an agency acting, or making a decision, but doing so incorrectly. Such circumstances simply are not embraced by the language of the law.

That ORS 183.490 does not mention affording relief for erroneous agency action comes as no surprise, for the APA elsewhere expressly provides for review in those circumstances. ORS 183.484(4)(b)(B) provides for review of an order in other than a contested case when the order is "[i]nconsistent with an agency rule." ORS 183.482(8)(b)(B) similarly provides for judicial review of such orders in contested cases. If we were to read ORS 183.490 as plaintiffs propose and the trial court did, that statute becomes duplicative of the other two. We find no suggestion from the text or the context of the statute that the legislature intended such duplication. *See Liberty Northwest Insurance Corp. v. Cotner,* 148 Or App 28, 31, 939 P2d 62 (1997); *Phelps and Nelson,* 122 Or App 410, 415, 857 P2d 900 (1993), *rev den* 318 Or 326 (1994) ("Whenever possible, we avoid construing statutes in a manner that renders one or more of their provisions meaningless."). To the contrary, taking the three statutes together, it is clear that the legislature intended each to cover different, complementary circumstances.

Having said that, we must acknowledge that our own cases are not in agreement on the proper construction of

ORS 183.490. We first construed the statute in *Bay River*. In that case, a housing developer sought subsurface sewage disposal permits from the Department of Environmental Quality (DEQ). After protracted negotiations, DEQ denied the request for a permit. The developer sought judicial review in the circuit court alleging that it was entitled to relief under, among other things, ORS 183.490. The circuit court held for the developer, declaring that the developer was entitled to its permit and enjoining DEQ from imposing any conditions on the issuance of the requested permit. We reversed. We first noted that:

> "[U]nlike ORS 183.480 to [ORS] 183.484 * * *, ORS 183.490 does not contemplate an appeal from an agency order, but, rather, *from an agency's failure to make an order on the merits.*"

*Bay River*, 26 Or App at 722 (emphasis supplied). We then held that, although the circuit court was the proper court in which the developer could raise its claim, relief under that statute "must be limited to compelling the agency to proceed with greater alacrity." *Id.* at 723. The statute does not authorize requiring the agency to act in a particular fashion, as the trial court had required. *Id.*

We next addressed the meaning and applicability of ORS 183.490 in *Lundy*. In that case, the plaintiff, an Employment Division (Division) employee, sought an annual merit salary increase. At the time, Division personnel rules conditioned merit salary increases on an objective job performance appraisal, rated by means of a numerical score. The plaintiff argued that the Division simply had assigned to him a score that ensured that he would not be entitled to the salary increase and brought suit under ORS 183.490 to compel the agency to grant him a salary increase. The trial court dismissed the action, but we reversed, reasoning as follows:

> "[W]hile the Employment Division retained the discretion both to establish the numerical score which would determine eligibility for merit salary increases and to formulate the procedures for arriving at such a score, the Employment Division put itself in a position that it could not exercise its discretion. Assuming that the allegations of the petition are true, the procedure for granting merit salary increases became essentially ministerial in nature.

> "Under these circumstances, where an agency has cho-
> sen to limit its discretion, it may be compelled pursuant to
> ORS 183.490 to perform an act which otherwise would have
> been discretionary."

*Lundy*, 31 Or App at 155. Our reasoning in that case is not
entirely clear, but it appears to be that, if an agency has cho-
sen to limit its discretion—so that a particular decision
becomes ministerial and nondiscretionary—the agency may
be compelled under ORS 183.490 to act accordingly. Hence,
in that case, because the Division had adopted procedures
that made annual merit salary review essentially a ministe-
rial decision, and because the plaintiff had alleged that the
Division had incorrectly performed that ministerial task, the
agency could be compelled under ORS 183.490 to do so
correctly.

We followed that decision with *Wyers*, in which the
Energy Facility Siting Council (EFSC) denied a petition for a
contested case hearing concerning the certification of the
Trojan nuclear power plant. The plaintiffs sued EFSC in cir-
cuit court under ORS 183.490, contending that the agency's
denial of their request for a hearing was erroneous. The cir-
cuit court agreed and ordered EFSC "to schedule and to con-
duct a hearing." EFSC appealed, arguing that ORS 183.490
did not apply. According to EFSC, ORS 183.490 applied only
to circumstances in which an agency fails to act, not to cir-
cumstances in which an agency acts incorrectly. We disa-
greed. Citing *Lundy*, we held:

> "ORS 183.490 authorizes review in the circuit court not
> only of a total failure on the part of an agency to act but also
> of a failure to act in accordance with a statutory or regula-
> tory duty. In the present case this would mean that, if the
> EFSC's denial of the contested case hearing was a discre-
> tionary act, then it is not reviewable pursuant to ORS
> 183.490. On the other hand if, as a matter of the substan-
> tive law and regulations governing the EFSC, it has a man-
> datory duty to hold such a hearing, then the circuit court
> could order it to do so pursuant to ORS 183.490."

*Wyers*, 42 Or App at 804.

We again construed ORS 183.490 in *Isom*. In that
case, a group of residential customers of an electric utility

sought to prevent it from shutting off their electricity during the winter months when doing so would endanger their health. They sued both the utility and the Public Utility Commissioner, alleging that the utility was prohibited by law from shutting off their electricity under those circumstances and that the Commissioner had refused to enforce the statute. The trial court dismissed the action for failure to state a claim. On appeal, we concluded that although the plaintiffs had stated a claim for relief under statutes authorizing the Public Utility Commissioner to adopt the requested rules, dismissal nevertheless was appropriate, because the plaintiffs had failed to exhaust available administrative remedies. We noted, in particular:

> "Under [an existing, applicable administrative rule] any customer may appeal a utility's decision to terminate service or its refusal to restore service by notifying the Commissioner by telephone, in writing or in person. The Commissioner then resolves the problem informally, if possible. Otherwise, it will be set for hearing at the request of the customer or the Commissioner. *If the Commissioner fails or refuses to act, the customer may petition the court to compel him to act pursuant to ORS 183.490*; or, if the Commissioner acts and the customer disagrees with the action or results, the customer may file suit against the Commissioner pursuant to ORS * * * 183.484."

*Isom*, 67 Or App at 103 (emphasis supplied; footnotes omitted). The opinion cited *Bay River*. There is, however, no mention of *Lundy* or *Wyers*.

Most recently, we construed ORS 183.490 in *Lake County v. State of Oregon*, 142 Or App 162, 920 P2d 1115 (1996), in which DSL and the Land Board rejected offers by the county to purchase certain state lands and decided to sell the land to another buyer. The county initiated an action against the state seeking declaratory and injunctive relief and seeking review under ORS 183.484 of an order in other than a contested case and under ORS 183.490. The trial court held that the petition for judicial review under ORS 183.484 was untimely, because it had been brought more than 60

days after the orders—the DSL's and the Land Board's dis-
approvals of the county's offers—had been issued, and it dis-
missed the petition brought under ORS 183.490, as well. We
affirmed on appeal. As to the petition for review under ORS
183.490 we noted:

> "Plaintiff also includes in its assignment of error the
> court's adverse ruling on plaintiff's allegations under ORS
> 183.490. Plaintiff does not develop its point in its argument
> here, and we do not discern how that statute might assist
> plaintiff. It provides the circuit courts with authority to
> compel an agency to act where it has 'unlawfully refused' to
> do so, or to compel the agency to make a decision that it has
> failed to make or unreasonably delayed. Here, the agencies
> *did* act, although they acted in ways that were contrary to
> plaintiff's desires, and their actions were reviewable under
> ORS 183.484. No relief under ORS 183.490 was available."

*Id.* at 167-68 (emphasis in original). We cited as authority
*Bay River*. Again, there is no mention of either *Lundy* or
*Wyers*.

Clearly, the cases cannot be reconciled. *Lundy* and
*Wyers* both hold that ORS 183.490 authorizes courts to com-
pel administrative agencies not merely to act, but also to act
*correctly. Bay River*, *Isom* and *Lake County*, in contrast, take
the view that the scope of the authority granted under ORS
183.490 is limited to compelling an agency to "proceed with
greater alacrity," not to proceed in a particular manner. Only
the latter line of cases is consistent with the statute itself,
properly read in the light of our interpretive obligations
under *PGE*. Accordingly, *Lundy* and *Wyers* must be
overruled.

■    In that light, the disposition of the case before us is
ineluctable. The trial court found—and plaintiffs do not con-
test—that DSL entered final orders in the form of executed
leases with plaintiffs, which orders did not contain terms con-
sistent with the 1983 revisions to the land exchange and

grazing lease policy. Plaintiffs challenge the correctness of those orders, arguing that they are contrary to the 1983 policy revisions. As in *Bay River* and *Lake County*, the agency did not merely fail to act, and plaintiffs do not merely seek an order compelling the agency to act. Instead, DSL *did* act, and plaintiffs seek an order compelling it to act differently. Plaintiffs may seek such an order under ORS 183.484(2), but they cannot do so under ORS 183.490, and the trial court erred in arriving at a contrary conclusion.

We turn then to the remaining claim regarding the 20-year lease terms, for declaratory relief, and DSL's argument on cross-appeal that the trial court erred in failing to dismiss it. DSL contends that, because the gravamen of plaintiffs' complaint is that DSL acted contrary to the 1983 policy, their sole and exclusive remedy lies under the APA. Plaintiffs complain that

"[t]he state cannot have its cake and eat it too. * * * If ORS 183.490 cannot be used * * *, as the state argues, then how else would the state suggest plaintiffs obtain redress for failure to act in accordance with agency rule and statutory duty? If the state is correct that ORS 183.490 does not apply (which it is not) redress should be available under the Declaratory Judgment Act."

DSL responds that redress would have been available under ORS 183.484, had plaintiffs timely filed their petition for judicial review.

■　　We agree with DSL. Directly on point is our decision in *Lake County*. In that case, as in this one, the plaintiff brought an action under ORS 183.484, ORS 183.490 and the Declaratory Judgment Act. The trial court dismissed all three, and we affirmed. We held that relief was not available under ORS 183.484, because the plaintiff had untimely filed its petition for judicial review. We held that relief was not available under ORS 183.490, as we have already described, because the case did not involve agency inaction. Finally, we held that relief was not available under the Declaratory Judgment Act:

"ORS 183.480(2) and numerous decisions of this court make clear that judicial review of final agency orders shall be solely as provided in the APA. *FOPPO v. County of Marion*,

93 Or App 93, 97, 760 P2d 1353 (1988), *rev den* 307 Or 326 (1989); *Mongelli v. Oregon Life and Health Guaranty*, 85 Or App 518, 522, 737 P2d 633 (1987). We said in *Bay River v. Envir. Quality Comm.*, 26 Or App 717, 720, 554 P2d 620, *rev den* 276 Or 555 (1976):

" 'The various APA statutes governing judicial review provide the sole and exclusive means of obtaining judicial review. * * *

" 'This is sufficient answer to Bay River's contention that since it couched its complaint in equitable terms and sought a declaratory judgment, the circuit court obtained jurisdiction pursuant to ORS 28.010.' * * *

"The same is true here."

*Lake County*, 142 Or App at 165. And the same is true in this case. We conclude therefore that the trial court erred in failing to dismiss plaintiffs' claim for declaratory relief.

Because we hold that the trial court erred in granting plaintiffs relief under ORS 183.490 and ORS 28.010, it follows that plaintiffs are not entitled to an award of attorney fees, and we need not address the parties' arguments further concerning that matter.

We address finally plaintiffs' claims for reformation of the leases to include valuation clauses, beginning with the facts relevant to those claims. Because the federal grazing leases were of a longer duration and were subject to cancellation on limited grounds, they were, at least potentially, of greater value than state leases for shorter periods of time. To provide an incentive for federal lessees to exchange their leases for state grazing leases, DSL proposed to some lessees that a clause be added, which provided that, in the event the state leases are not renewed, any subsequent lessees must agree to pay the prior lessee the remaining market value of the federal leases. These "valuation clauses" were included in some of the leases, but were not included in others. Those lessees whose leases did not contain valuation clauses fell into two groups.

The first group is exemplified by the lease with plaintiff Jenkins Ranch, Inc., owned and operated by Richard

Jenkins. Jenkins agreed to exchange a federal grazing permit for a lease of state lands. DSL sent a proposed grazing lease to Jenkins in 1983 containing a valuation clause, but also containing numerous blank spaces for several material terms, such as the number of acres to be leased and the amount of the rent obligation. The proposal also contained a blank space for the term of the lease, and DSL had written "10 years" in that space in pencil. Jenkins hired an attorney to handle the lease negotiations. As a result of the negotiations, Jenkins was able to obtain an increase in the term of the lease to 20 years with an automatic 20-year renewal period. The final copy of the lease issued two years after the proposed version contained no valuation clause. Neither party mentioned to the other the removal of the clause. Jenkins, in fact, never read the complete agreement and did not know that the clause had been in the original proposal.

The second group is exemplified by the lease with plaintiffs Lazaro and Vivian Mendieta and their predecessors in interest. The predecessors, the Ross family, obtained a 10-year state grazing lease that expired in 1992. That lease contained a valuation clause. In 1990, the Ross family faced financial trouble and signed over the lease rights to the Farm Credit Bank. DSL then advised the bank that a new lease would need to be issued in the bank's name. DSL sent a form of lease to the bank that lacked a valuation clause. Neither the bank nor DSL mentioned the missing valuation clause. The Mendietas purchased the lease from the bank in 1991. The lease expired a year later. In 1992, however, DSL renewed the expired lease for a one-year period. The new lease agreement did not contain a valuation clause, and the Mendietas knew that. The lease was renewed two more times for a year and one more for an additional nine-month period. In each case, the lease did not contain a valuation clause.

When plaintiffs filed their complaint in this action, they alleged that they are entitled to reformation of the leases based on a unilateral or mutual mistake as to the failure to include the valuation clauses. Plaintiffs asked the court to certify two subclasses, one represented by Jenkins Ranch and the other represented by the Mendietas. The trial court certified the two subclasses, over the objections of intervenors and the state.

At trial, DSL argued that the reformation claims should be dismissed, because the APA supplies the sole and exclusive remedy against state agencies. The trial court agreed, holding that, because the leases amounted to administrative orders issued in other than contested cases, the exclusive remedy lies under ORS 183.484, and, because the complaint had been filed well beyond the 60-day limitation period applicable to such actions, the reformation claims were not subject to judicial review. The trial court did not stop there, however. It further held that, in the event that it does have authority to review the reformation claims, plaintiffs had established clear and convincing evidence of their entitlement to that equitable relief.

Plaintiffs cross-appeal the trial court's conclusion that it lacked authority to review the reformation claims, arguing that, in our subsequent decision in *Premier Technology v. Oregon State Lottery*, 136 Or App 124, 901 P2d 883 (1995), we held that the plaintiff could maintain a common-law contract claim against a state agency. DSL contends that the trial court correctly concluded that plaintiffs' exclusive remedy lies under the APA. According to DSL, *Premier Technology* does not apply, because that case held more narrowly that plaintiffs may bring actions for *breach* of contract only, not for broader contractual remedies. DSL argues that to hold otherwise would require ignoring ORS 183.480(2) and "over 20 years of case law," in particular, *Clarke Electric, Inc. v. State Highway Division*, 93 Or App 693, 763 P2d 1199 (1988). In the alternative, DSL asserts, by way of cross-assignment, that, even if the trial court had authority to rule on the reformation claims, the portion of the judgment concerning those claims should be affirmed on the ground that neither subclass has established clear and convincing evidence of their entitlement to the remedy that they seek.

We begin with the question whether the courts have authority to consider reformation claims asserted against a state agency. The controlling authority is our decision in *Premier Technology*. In that case, the plaintiff, Premier, entered into a video lottery game lease agreement with the Oregon State Lottery (the Lottery), under which Premier agreed to lease to the Lottery video lottery terminals. The

lease agreement contained a termination clause that provided, among other things, for termination upon written notice from the Lottery that Premier acted in a way that "jeopardizes the integrity, security, honesty or fairness of the Lottery." Approximately one week after the agreement was executed, the Lottery sent Premier a letter invoking the termination clause on the ground that a security investigation of Premier had produced information establishing grounds for doing so. Premier sued the Lottery for breach of contract. The Lottery moved for, and obtained, summary judgment on the ground that the termination letter was an order, subject to review solely under the APA. We reversed, distinguishing between a claim that an agency has violated a statute, rule or policy governing the conduct of the agency and a claim that an agency has acted in a manner that breaches a contract:

> "The sole avenue for review of the validity of final agency orders is through the APA. ORS 183.480(2). Even if the letter is an order in other than a contested case, however, plaintiff is not precluded from pursuing a breach of contract action against an agency that allegedly used the order to breach the agreement. Plaintiff's claim does not challenge the validity of the order; it claims that the order communicated the fact of the breach of the terms of the contract. Thus, it is not seeking judicial review of the agency action for compliance with administrative law, but instead is seeking a remedy for the consequences caused by the order, *i.e.*, it allegedly constituted a breach of the contract. The question of whether an agency's action is in violation of the terms of an agreement the agency has made with another party is not a question of administrative law; it is a classic question of contract law."

*Premier Technology*, 136 Or App at 131-32.

■       In this case, in their reformation claims, plaintiffs do not seek judicial review of an agency order for compliance with any administrative law. The validity of the agency orders—the state grazing leases—is not challenged. Instead, as in *Premier*, plaintiffs contend that they entered into a contractual relationship with the agency and that, on the basis of that contractual relationship alone, it is entitled to certain remedies. As in *Premier*, plaintiffs' reformation allegations present "a classic question of contract law." *Id.* at 132.

DSL's arguments to the contrary are not persuasive. In particular, its reliance on *Clarke Electric* is misplaced. In that case, the plaintiff brought an action for negligence, negligence *per se* and statutory tort on the basis of the State Highway Division's failure to comply with statutory duties regarding the approval of bids to perform Highway Division construction work. We held that the plaintiff could not maintain his tort claims against the state agency because the agency's "alleged liability in tort is premised on a finding that [the agency's] order rejecting the bid was improper" under the statutes and rules that govern the contract bidding process. *Clarke Electric, Inc.*, 93 Or App at 697. In this case, plaintiffs' requested relief in no way depends on the validity or invalidity of an agency order. It is predicated exclusively on principles of contract of law that are brought to bear as a consequence of the parties' conduct, regardless of the validity of the orders themselves. We conclude, therefore, that the trial court erred in holding that it lacked the authority to entertain plaintiffs' reformation claims.

Ordinarily, such a conclusion would warrant reversal and remand for further proceedings. In this case, however, the trial court anticipated our decision and entered findings and conclusions in the event that its conclusion as to the reviewability of the claims proved in error. The parties likewise briefed the merits of the reformation claims; indeed, plaintiffs ask us not merely to reverse and remand for further proceedings on the claims, but to reverse and enter judgment in their favor on the merits. Under the circumstances, there is no reason to remand, and we proceed to an examination of whether plaintiffs are entitled to the relief that they seek.

■ To obtain reformation of a contract, the party seeking that remedy must prove by "clear and convincing" evidence,

> "(1) that there was an antecedent agreement to which the contract can be reformed; (2) that there was a mutual mistake or a unilateral mistake on the part of the party seeking reformation and inequitable conduct on the part of the other party; and (3) that the party seeking reformation was not guilty of gross negligence."

*Allen & Gibbons Logging v. Ball*, 91 Or App 624, 629, 756 P2d 669 (1988) (citing *Jensen v. Miller*, 280 Or 225, 228-29, 570 P2d 375 (1977)); *see also Gilbert et al v. Calif.-Ore. Power Co.*, 223 Or 1, 14, 353 P2d 870 (1960). We review the trial court's decision on a *de novo* basis. ORS 19.125(3); *Scoville v. Hampton*, 217 Or 256, 276, 340 P2d 952 (1959). With those principles in mind, we turn to the claims of each of the two subclasses and the state's arguments.

■ First, as to the Jenkins Ranch subclass, DSL argues that there is no basis for reforming the grazing leases to include valuation clauses because there was no antecedent agreement to which the leases could be reformed, because there was no unilateral mistake coupled with inequitable conduct and because those plaintiffs were grossly negligent in failing to read their leases before signing them.

We agree with DSL that there was no "clear and convincing" evidence of an antecedent agreement and do not address the state's other arguments. The evidence shows that neither Jenkins nor his lawyer ever discussed the subject of a valuation clause with representatives of DSL. Jenkins did not know whether the 1983 draft contained such a clause. Nor did he know whether the final agreement contained such a clause. There is no evidence, in fact, that any of the parties expected that such a clause would be in the agreement. The only mention of a valuation clause is the inclusion of one in a draft that was circulated two years before the final lease agreement was executed, and that draft does not constitute an antecedent agreement; the fact is that no one agreed to it. Jenkins, in fact, rejected it when he proposed contrary terms regarding the length of the lease. Thus, the only terms to which the parties agreed are contained in the final lease agreement, which contains no valuation clause. In short, there was no antecedent agreement to which the final agreement could be reformed. Accordingly, plaintiffs in the Jenkins Ranch subclass are not entitled to reformation of their state grazing leases to include valuation clauses.

■ Second, as to the Mendieta subclass, DSL argues that those plaintiffs cannot obtain reformation for the simple reason that the leases that they seek to have reformed have long since expired, and, since then, the parties knowingly

have entered into leases not containing the valuation clauses. Again, we agree with DSL. It may well be that, when the bank first drafted the new lease in 1990, the valuation clause that was in the original lease mistakenly was excluded. The fact remains that the lease expired in 1992. Three one-year renewals followed. In each case, the agreements contained no valuation clauses, and in each case, the Mendietas knew that the agreement contained no valuation clause. Thus, there was no mistake as to the subsequent agreements, and the agreement about which there may have been a mistake has long since expired. There is nothing left for us to reform. Plaintiffs in the Mendieta subclass cannot prevail on their reformation claims.

Judgment awarding plaintiffs relief under ORS 28.010 and ORS 183.490 reversed; otherwise affirmed on appeal and cross-appeal.